# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 14-51117

UNITED STATES OF AMERICA,

Plaintiff - Appellee

United States Court of Appeals
Fifth Circuit

**FILED**
April 13, 2016

Lyle W. Cayce
Clerk

v.

BRANDON EARL BARKER,

Defendant - Appellant

Appeal from the United States District Court
for the Western District of Texas

Before JONES and SMITH, Circuit Judges and FITZWATER,* District Judge.
EDITH H. JONES, Circuit Judge:

Brandon Earl Barker ("Barker") appeals his convictions under 18 U.S.C. § 2252(a)(2) and 18 U.S.C. § 2252(a)(4) for one count of possession of child pornography and four counts of attempt to receive child pornography. He argues that the district court's admission of the out-of-court statements of a child victim to a Texas-certified Sexual Assault Nurse Examiner ("SANE") violated his Sixth Amendment confrontation right. Because we hold, following *Ohio v. Clark*, ___ U.S. ___, 135 S. Ct. 2173 (2015), that the child's statements to the SANE were non-testimonial, we affirm the district court's admission of the testimony and the conviction.

---

* District Judge of the Northern District of Texas, sitting by designation.

No. 14-51117

## BACKGROUND

In July 2013, during a period of attempted marital reconciliation, Barker's ex-wife discovered files on his desktop computer with titles indicative of child pornography. She recorded a cell phone video of the location of the files. After arguing over the custody of the couple's child a few days later, Barker's ex-wife told him she did not think that her daughter was safe in his care and she "knew what he was doing on his computer." She then informed the police that she had discovered child pornography on Barker's computer. The police seized Barker's computer. A forensic analysis subsequently discovered over 180 images, over 100 files, and one video of child pornography.

At Barker's trial, the Government moved in limine to introduce evidence of Barker's alleged prior sexual abuse of a young girl. In its proffer outside the presence of the jury, the Government called Judy LaFrance ("LaFrance"), the director of nursing in the emergency department of Hendrick Medical Center and a Texas-certified SANE. LaFrance testified to the duties of a SANE, noting that a SANE is tasked with medically evaluating a patient referred by law enforcement for a sexual assault exam.[1] The police are not present during this examination; the nurse and patient are alone in the room. The evaluation comprises obtaining an assault history from the patient, performing a head-to-toe physical examination, and preparing the patient for a discharge. The medical history is essential to proper and complete diagnosis and treatment of the patient. Before discharge, the SANE may recommend

---

[1] To become certified, LaFrance received extra training in OB-GYN procedures and exposure to criminal justice practices. A SANE is a medical first responder to cases involving possible sexual assault.

2

specialty referrals, prescribe medications, and consider safety measures[2] to ensure the patient's future well-being. Though LaFrance stated that the purpose of an exam is to "ensure the medical well-being" of the patient, a SANE also writes a report that is turned over to law enforcement and, if necessary, collects evidence.

After describing the duties of a SANE, LaFrance discussed a specific examination that she performed in June 2003 on a four and a half year old juvenile, A.M., upon the referral of the local police. The juvenile and her mother—who was Barker's girlfriend at the time—arrived at the hospital emergency room where LaFrance examined her. LaFrance testified that when she obtained A.M.'s assault history, the girl stated that she was at the hospital because: "'Last night my daddy put his peepee thing'—and she pointed to a penis on a male doll—'in my mouth. We were at our new house. My mom was at work. Bubba was there. And we were in my mom and daddy's waterbed.'" LaFrance also testified that her examination of A.M. revealed redness or tenderness underneath the girl's tongue.

Barker objected to LaFrance's testimony and contended that A.M.'s statements were hearsay, as well as testimonial in nature in violation of the Confrontation Clause. However, the district court concluded that the statements posed no Confrontation Clause problem and that they were admissible under Fed. R. Evid. 803(4), a hearsay exception for statements made for medical diagnosis or treatment.[3] Before the jury, LaFrance testified

---

[2] For a child sexual assault victim, LaFrance testified that safety measures would include ensuring that the child is discharged into the custody of an appropriate person. LaFrance indicated that Child Protective Services could be contacted, if necessary.

[3] Barker does not raise on appeal an issue of admissibility under Rule 803(4). Further, the Government did not offer LaFrance's written report of her examination of A.M. into evidence.

No. 14-51117

as described above to the general role of a SANE and to her examination of A.M. The jury convicted Barker on one count of possession of child pornography and four counts of attempt to receive child pornography. He timely appealed.

## DISCUSSION

The sole issue on appeal is whether the admission of A.M.'s statements through LaFrance's testimony violated Barker's rights under the Confrontation Clause. We review a Confrontation Clause challenge *de novo*, subject to harmless error analysis. *United States v. Duron-Caldera*, 737 F.3d 988, 992 (5th Cir. 2013).

## I.

The Sixth Amendment provides in pertinent part: "in all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. amend. VI. The Confrontation Clause requires that the accused be afforded the opportunity to confront those witnesses who "bear testimony," defined as "a solemn declaration or affirmation made for the purpose of establishing or proving some fact," against him unless the witness is unavailable and the defendant had a prior opportunity to cross-examine the witness. *Crawford v. Washington*, 541 U.S. 36, 51, 124 S. Ct. 1354, 1364 (2004) (quoting 2 NOAH WEBSTER, AN AMERICAN DICTIONARY OF THE ENGLISH LANGUAGE (1828)). A statement is "testimonial" if "the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution." *Davis v. Washington*, 547 U.S. 813, 822, 126 S. Ct. 2266, 2274 (2006). In evaluating the statements, courts determine "whether, in light of all the circumstances, viewed objectively, the primary purpose of the conversation was to create an out-of-court substitute for trial testimony." *Clark*, 135 S. Ct. at 2180 (citing

4

No. 14-51117

*Michigan v. Bryant*, 562 U.S. 344, 358, 131 S. Ct. 1143, 1155 (2011)) (internal quotations and brackets omitted).

Several times, the Supreme Court has discussed the Confrontation Clause implications of statements made by individuals to law enforcement officers. *See, e.g.*, *Bryant*, 562 U.S. at 349, 131 S. Ct. at 1150; *Davis*, 547 U.S. at 817, 126 S. Ct. at 2271; *Crawford*, 541 U.S. at 39–40, 125 S. Ct. at 1357. By virtue of their "dual responsibilities" as "first responders" in tending to ongoing emergencies and as "criminal investigators" in gathering evidence and building a case for a nascent prosecution, their statements made to police are often likely to raise Confrontation Clause issues. *See Bryant*, 562 U.S. at 368, 131 S. Ct. at 1161. Accordingly, factors such as "whether an ongoing emergency exists" and "the informality of the situation and the interrogation" are especially helpful guideposts for distinguishing between the dual roles played by the police in a given conversation. *See Clark*, 135 S. Ct. at 2180 (citation omitted).

But, as the Supreme Court recently observed, statements made to non-law enforcement officers, "are much less likely to be testimonial than statements to law enforcement officers." *Id.* at 2181. This is at least true as to statements made by "very young children," which "will rarely, if ever, implicate the Confrontation Clause." *Id.* at 2182. Because preschool children generally lack an understanding of our criminal justice system, let alone the nuances of a prosecution, it is highly unlikely that a child intends his or her statements to substitute for trial testimony. *Id.*

## II.

The parties here disagree over the controlling status of the Supreme Court's decision in *Clark*. In *Clark*, the statements of Clark's girlfriend's son, L.P., to his preschool teachers were introduced at Clark's criminal trial for felonious assault, endangering children, and domestic violence. *Id.* at 2178.

No. 14-51117

The Court held that L.P.'s statements, which answered the teachers' questions about L.P.'s red eye and red marks on his face and which identified Clark as the abuser, were admissible and did not pose a Confrontation Clause problem even though L.P. was legally incompetent to testify.

The Court held that the primary purpose of the conversation was not to "gather evidence for Clark's prosecution," but "the first objective was to protect L.P." *Id.* at 2181. Because the teachers were unsure who was abusing the child, their questions to L.P. were aimed at discovering the abuser's identity and ensuring that L.P. could be safely released to his guardian at the end of the day; the Court construed this responsibility as presenting the teachers with an ongoing emergency. *Id.* Moreover, the Court noted, the preschool lunchroom setting where L.P. was questioned did not resemble "the formalized station-house questioning" deemed problematic in previous Confrontation Clause cases. *Id.* The Court also stressed that L.P.'s age was significant because a three-year old child would not intend his statements to be used as a substitute for trial testimony. *Id.* at 2182. Finally, the Court focused on the identity of the questioner and the stark difference between the relationship of a teacher and student and that of a police officer and citizen. *Id.*

*Clark*'s analysis guides this case. The primary purpose of the conversation between LaFrance and A.M. was to medically evaluate and treat the young girl. Moreover, the child's statements pertaining to the circumstances of the abuse were relevant to ensuring that A.M. would not be discharged into the custody of a sexual abuser.[4] As in *Clark*, this was an

---

[4] Even if some of A.M.'s statements concerning the setting and circumstances of the abuse could be construed as not relating to the primary purpose of securing medical evaluation and treatment and might have been inadmissible (but we do not rule on this issue), their admission was harmless error. *See Duron-Caldera*, 737 F.3d at 992 (providing that Confrontation Clause challenges are subject to a harmless error analysis). In this case, the Government presented another witness, Officer Michelle Sheedy, who testified to

## No. 14-51117

ongoing emergency. In short, A.M.'s well-being and health were the principal focus of this visit to the emergency room. This conclusion is buttressed by the significant fact of A.M.'s age: four and a half years. Like a three year old boy, A.M. lacked the understanding of the criminal justice system to intend her comments to function as a substitute for trial testimony.

Moreover, although LaFrance questioned A.M. in a hospital emergency room, a more formal environment than a preschool lunchroom, the setting is far different from the law enforcement interrogation that has been found to raise Confrontation Clause problems in other cases. *Cf. Hammon v. Indiana,* 547 U.S. 813, 830, 126 S. Ct. 2266, 2278 (2006) (witness questioned by the police while isolated from others and whose replies were to be used in a police investigation); *Crawford*, 541 U.S. at 65–66, 124 S. Ct. at 1372–73 (statements made by a suspect in police custody in response to leading questions by the police and whose release from custody was allegedly dependent upon the progress of the investigation). To conclude otherwise would "ignore th[e] reality," that the relationship between a nurse and patient is "very different from that between a citizen and the police." *Clark*, 135 S. Ct. at 2182. A nurse, unlike a police officer, is principally tasked with providing medical care, not "uncovering and prosecuting criminal behavior." *Id.*

Barker attempts to distinguish *Clark* by emphasizing that LaFrance's SANE certification converted the primary purpose of A.M.'s examination from medical evaluation and treatment to criminal evidence-gathering in

---

Barker's alleged sexual abuse of A.M. Moreover, two other witnesses, Barker's ex-wife and a Homeland Security forensic analyst who examined Barker's computer, testified about the child pornography found on Barker's computer. Because significant evidence presented at Barker's trial supported the conviction, there is no reasonable possibility that any potentially non-testimonial statements by A.M. contributed to the conviction. *See United States v. Alvarado-Valdez,* 521 F.3d 337, 341 (5th Cir. 2008) (identifying the "no reasonable possibility" standard and the considerations that would inform that analysis).

preparation for a prosecution.  In *Clark*, however, the teachers' mandatory reporting obligations under Ohio law did not alter the Court's conclusion that the primary purpose of their conversation with L.P. was to protect the child, not gather prosecution evidence.  *Id.* at 2183.  Indeed, in light of this conclusion, it was "irrelevant that the teachers' questions and their duty to report the matter had the natural tendency to result in Clark's prosecution." *Id.*

*Clark* cuts the other way.  LaFrance's SANE certification did not convert the essential purpose of her conversation with A.M from medical evaluation and treatment to evidence-collection, though it may have tended to lead to Barker's prosecution.   Like all good nurses, LaFrance would have acted with the principal purpose to provide A.M. with medical care—whether or not she possessed the SANE certification.  *See id.*  Similarly, the teachers in *Clark* would have questioned L.P. in order to protect him whether or not they had a duty to report the assailant to law enforcement.  As a result, LaFrance's SANE certification does not alter the non-testimonial nature of A.M.'s statements.

## CONCLUSION

Because the primary purpose of the conversation between LaFrance and A.M. was to medically evaluate and treat the child, the victim's statements were non-testimonial and their admission at Barker's trial through LaFrance's testimony did not violate the Confrontation Clause.

The judgment of conviction is **AFFIRMED**.